**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

|  |  |
|---|---|
| CSX TRANSPORTATION, INC., | |
| *Plaintiff,* | |
| *v.* | Civil Action No. 3:24-cv-00271 |
| COX COMMUNICATIONS HAMPTON ROADS LLC, | |
| *Defendant.* | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, CSX Transportation, Inc. ("CSXT"), brings this Complaint against Cox Communications Hampton Roads LLC ("Cox").

**Introduction**

1.     This is an action for a declaratory order and injunctive relief arising from Cox's threatened unauthorized access upon and interference with CSXT's railroad property and railroad operations.

2.     CSXT is a federally regulated rail carrier engaged in interstate rail transportation activities on its real property interests. CSXT has the right to control its real property and railroad operations and to impose reasonable requirements to ensure the continuity and safety of railroad operations and to protect CSXT's employees and the public.

1

3.      Cox has historically complied with CSXT's standard policies and permitting requirements governing installations on, under, or above CSXT's active rail lines to facilitate railroad and public safety.

4.      CSXT recently received a purported "notice" that Cox intends to ignore CSXT's safety and permitting processes and instead proceed with an unauthorized installation under CSXT's fee-owned operating property in Chesapeake, Virginia.

5.       In support, Cox cites to Virginia Code Ann. §56-16.3, a statute enacted last year which purports to permit broadband service providers to access, cross, and occupy property owned by railroads.

6.      Virginia Code. Ann. §56-16.3 ignores the historical understanding that property owners get to decide who can access their property when and where. Instead, it purports to require railroads to give broadband service providers a permanent easement to use the railroad's property without complying with railroad safety requirements and without fully reimbursing costs incurred by the railroad.

7.      As set forth below, CSXT requests that this Court issue an order: (i) preliminarily and permanently enjoining Cox from proceeding with the unauthorized installation on CSXT's railroad property or otherwise interfering with CSXT's railroad operations; (ii) declaring that §56-16.3 is preempted by federal law governing rail transportation; and (iii) declaring that §56-16.3 violates both the Virginia and United States Constitutions.

## Parties

8.     Plaintiff CSXT is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 500 Water Street, Jacksonville, Duval County, Florida 32202.

9.     CSXT is one of the largest railroad transportation companies in the United States. CSXT provides common carrier rail transportation services across a rail network consisting of approximately 20,000 route miles of track in 26 states, the District of Columbia and two Canadian provinces. CSXT operates and maintains more than 2,000 miles of active railroad lines in the Commonwealth of Virginia alone.

10.     CSXT is a Class I railroad as defined by the Surface Transportation Board and a "rail carrier" as defined by federal law, 49 U.S.C. § 10102(5).

11.     Cox Communications, Inc., is the "largest private broadband provider in the United States." *About Us*, Cox (last accessed Apr. 8, 2024) https://perma.cc/Q77C-A7BP. It is headquartered in Atlanta, Georgia. It operates fiber broadband networks across the United States and is the third largest cable provider in the United States. It boasts $13 billion in revenue and is a wholly-owned subsidiary of Cox Enterprises, which boasts nearly $20 billion in annual revenue. *Cox Communications*, Cox Enterprises (last accessed Apr. 8, 2024), https://perma.cc/FJ4J-78W4; *Cox Communications Fact Sheet*, Cox (last accessed Apr. 8, 2024), https://perma.cc/N5NB-NZDX.

12.     Upon information and belief, Cox Communications, Inc., is doing business in Virginia as Cox Communications Hampton Roads LLC.

## Jurisdiction and Venue

13.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

14.     The Court has supplemental jurisdiction over CSXT's claims under Virginia law under 28 U.S.C. §1367.

15.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

16.     This Court has personal jurisdiction over Cox because Cox conducts business in the Commonwealth of Virginia and has provided "notice" of its intent to cross CSXT's property in Virginia pursuant to Virginia Code Ann. § 56-16.3.

17.     CSXT seeks, and this Court may grant, declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, Rule 65 of the Federal Rules of Civil Procedure, and this Court's inherent equitable powers.

18.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. §1391(b)(2) because the property that is subject to the action is situated in this judicial district.

## Factual Allegations

### I.   CSXT Exclusively Owns the Railroad Property in Fee Simple.

19.     Through several deeds executed in the 1830's, CSXT's predecessor Portsmouth and Roanoke Railroad acquired fee simple title to a railroad corridor located in Chesapeake, Virginia (the "Railroad Property").

20.     Since then, CSXT and its predecessor railroads have continuously owned and operated a railroad line on the Railroad Property that connects Portsmouth, Virginia to CSXT's main line running from Richmond, Virginia to Tampa, Florida. CSXT currently operates active railroad track on the Railroad Property to move freight in interstate commerce.

## II.     CSXT's Standard Policies and Permitting Requirements Installation of Utilities On, Under or Over CSXT's Railroad Property.

21.     To promote the safety and integrity of CSXT's railroad operations, its employees, and the surrounding public, CSXT has spent significant time and resources developing standard policies and permitting requirements for outside parties seeking to install fiber optic cables on, under or over CSXT's active rail lines. *Permitting Information Packet*, CSX (May 11, 2020), https://perma.cc/YM8M-QKW6 (describing those procedures).

22.     To ensure that each proposed installation meets CSXT's reasonable engineering and safety requirements, CSXT must conduct an engineering and design review of the proposed plans and often requires a flagman or inspector on-site during the installation to protect CSXT's railroad operations, including CSXT's wayside and grade crossing signal systems. To reimburse CSXT for its time and professional expenses, CSXT requires payment of certain reasonable charges to offset those administrative, engineering review and inspection costs. CSXT also requires that applicants execute CSXT's standard encroachment agreement with appropriate maintenance, relocation, indemnification and insurance requirements governing the current and future use of the broadband facilities on CSXT's property.

23.     Upon final approval and execution of the required agreement, any outside party seeking to perform utility installation work on CSXT's railroad right-of-way must submit an Outside Party Request form to coordinate the appropriate flagging and/or inspection services, the scheduling of which is subject to flagging availability and union bargaining agreements.

24.     To expedite this process, CSXT has invested millions of dollars on technology and resources on the customer interface portals, contract systems, GIS systems, and a database as to where and what is located on its privately owned or controlled property. Earlier this year, CSXT developed and implemented a chatbot enhanced with artificial intelligence to further streamline this process.  CSXT's average turnaround time from application submission to agreement in Virginia is 25 days for a standard fiber utility crossing (assuming the applicant complies with CSXT's requirements up front).

25.     CSXT works cooperatively with utilities, broadband companies, and state and local agencies to timely process crossing applications across CSXT's approximately 20,000 route mile rail network. CSXT's requirements are reasonable and customary in the railroad industry.

26.     When railroads' permitting processes are not followed, broadband and other utility installations on railroad property, both overhead and subgrade, can have a dramatic impact on rail service to customers and public safety, as well as the overall integrity of the infrastructure.  For example, unauthorized aerial installations of low hanging wires have caused accidents, delays and shutdowns to rail-based interstate

6

commerce.  Furthermore, improperly designed and installed subgrade installations have caused sink holes beneath railroad tracks and damaged railroad signal facilities and existing utility installations.

27.     In one particularly egregious example, unauthorized fiber-optic installation contractors struck and severed an underground CSX signal cable earlier this year, disrupting a highway-rail grade crossing warning system. The fiber-optic contractors apparently tried to "fix' the problem by tying the crossing gate upright using rope, meaning the public could cross over the tracks at the grade crossing even if a train was approaching. Below are photographs taken by CSX railroad police after the boring contractors fled the area:



Abandoned boring machine near CSX grade crossing on.



Side view of boring machine with drill rods extending into the ground.



Crossing gate arm tied in the upright position with type of rope used in boring.

### III.  Cox Disregards CSXT's Safety and Permitting Requirements

28.     Eagle 1 Resources, LLC ("Eagle 1") and its managing member Dave Thomas reportedly represent Cox as "consultants" for the placement of fiber optic cables in the Chesapeake, Virginia area.

29.     CSXT recently received correspondence from Eagle 1 purporting to give notice that, on or about Monday, April 15, 2024, Cox and/or Eagle 1 intend to drill underneath CSXT's Railroad Property located in the vicinity of the Hampton Roads Executive Airport to install fiber optic conduit and cables ("Notice").  A copy of the Notice is attached as Exhibit A.

30.     The recent Eagle 1 "Notice" makes clear that Cox intends to ignore CSXT's standard permitting requirements and instead purports to provide "notice" that Cox "will be crossing" CSXT's fee-owned Railroad Corridor in the vicinity of a public road crossing that provides access to an executive airport only "minutes from downtown Newport News, Norfolk and Virginia Beach." *Hampton Roads Executive Airport*, flypvg.com (last accessed Apr. 8, 2024), https://perma.cc/Y72F-QSMZ.

31.     Eagle 1 further contends that Cox, rather than CSXT, purportedly has discretion to determine if flaggers or inspectors are necessary to ensure railroad safety during the installation.

32.     In support, Cox and Eagle 1 cite to Virginia Code Ann. §56-16.3, a statute enacted last year which purports to permit broadband service providers to access, cross, and occupy property owned by railroads.

33.     Since receiving the Notice, CSXT's real estate employees have consistently reiterated to Cox employees that Cox's proposed installation may not proceed absent compliance with CSXT's standard permitting processes.  CSXT further requested that Cox sign its agreement consistent with CSXT's practice prior to §56-16.3. Cox refused to sign the agreement.

34. The Notice also asserts that a copy of Cox's insurance has been "previously provided" to CSXT. At this time, CSXT has not been able to identify the specific insurance policy referenced and, in any event, has reason to believe that Cox's insurance is insufficient absent an executed agreement.

35. On April 10, 2024, CSXT's counsel sent a letter to Cox's in-house counsel explaining that §56-16.3 is subject to a pending lawsuit in this Court and is unconstitutional and preempted by federal law. CSXT's counsel further reiterated that: (i) the Notice fails to comply with §56-16.3 in the first instance; and (ii) Cox's proposed installation may not proceed absent compliance with CSXT's standard permitting process. A copy of this correspondence is attached as Exhibit B.

36. To date, CSXT has not received a response from Cox. Based upon prior experience, CSXT has reason to believe that Cox may, without CSXT's consent or authorization, knowingly and surreptitiously attempt to install the fiber optic cable on, under and through CSXT's Railroad Property, thereby interfering with CSXT's exclusive use and possession of its fee-owned Railroad Property.

37. Cox's unauthorized and unsupervised proposed boring beneath the CSXT Railroad Property poses hazards to CSXT's vital equipment and facilities that could jeopardize the safety of rail operations and the integrity of CSXT's track structure, which could lead to injuries to CSXT's equipment, personnel or the public.

## IV. Virginia Code § 56-16.3 Gives Broadband Companies Broad Authority to Install Crossings on Railroad Property.

38. In the Notice, Cox claims that it can ignore CSXT's permitting processes and instead proceed under Virginia Code § 56-16.3. Section 56-16.3 gives broadband

service providers a statutory right to take an irrevocable license to cross and perma-nently occupy railroad works, including "tracks, bridges, facilities, and all … rights of way or easements." Va. Code Ann. § 56-16.3.

39.    It purports to give broadband service providers this statutory right any time the service provider "deems it necessary in the construction of its systems." Va. Code Ann. § 56-16.3(B). To invoke this statutory right, a broadband service provider is only required to submit an application to the railroad whose property will be crossed. That application must meet minimal requirements including information about the crossing location and the project plans. Va. Code Ann. § 56-16.3(C)(1).

40.    The railroad receives only minimal statutory fees for the crossing. Re-gardless of the size or scope of the project or the magnitude of the inconvenience on railroads, the broadband service provider is only required to pay a one-time fee of $2,000. Va. Code Ann. § 56-16.3(G). And while the provider must pay for direct ex-penses, the direct expenses cannot exceed $5,000. *Id.*

41.    Two exceptions to the license fee requirement permit a broadband com-pany to pay even less in some circumstances. The fee is $1,000 if the service provider attempts to cross "a section of track that has been legally abandoned pursuant to an order of a federal or state agency," and "is not being used for railroad service." Va. Code Ann. § 56-16.3(I). And services providers don't have to pay *any* license fee for "a crossing of the railroad company's works within a public right-of-way." *Id.* § 56-16.3(K).

42.     A railroad company has limited options, and time, to respond to an application. The railroad company "shall approve" the application "within 35 days after the application is received." Va. Code Ann. § 56-16.3(C)(4). The railroad company then must schedule the crossing date "within 30 days of the approval of the crossing application." Va. Code Ann. § 56-16.3(E). The statute does not include any option for the railroad company to reject the application.

43.     If an application is incomplete, a railroad company can request more information, but it must do so within 15 days of receipt of the application. Va. Code Ann. § 56-16.3(C)(3).

44.     Once it has approved an application, a railroad company must help in the installation of the crossing. The railroad is responsible for inspecting and monitoring the crossing site. Va. Code Ann. § 56-16.3(G). The railroad company is also responsible "for flagging operations and other protective measures" during the construction of fiber optic broadband lines. *Id.* § 56-16.3(F). But the broadband service provider is "responsible for ensuring that the crossing is constructed and operated in accordance with accepted industry standards." *Id.* § 56-16.3(F).

45.     A railroad company's statutory avenues to challenge a crossing are narrow. A railroad company may petition the State Corporation Commission for relief, but its ability to do so is limited to three statutory grounds. Va. Code Ann. § 56-16.3(H). A railroad company may seek relief because "(i) the license fee is not adequate compensation for the proposed crossing, (ii) the proposed crossing will cause undue hardship on the railroad company, and (iii) the proposed crossing will create

11

the imminent likelihood of danger to the public health or safety." Va. Code Ann. § 56-16.3(H). There are no other statutory grounds to challenge a crossing.

46.     The State Corporation Commission must "adjudicate any petition . . . and issue a final order within 90 days" of the petition. Va. Code Ann. § 56-16.3(H). In resolving the petition, the Commission "may make any necessary findings of fact and determinations" to resolve the petition "including any amount to which the railroad company is entitled in excess of the license fee." Va. Code. Ann. § 56-16.3(H). The Commission can choose to "employ expert engineers, to be paid equally by both companies," to assist it. Va. Code Ann. § 56-16.3(H).

47.     The statute does not halt work on a crossing while the State Corporation Commission considers a petition in all instances. In fact, it instructs that the Commission can consider a petition raising a challenge to the adequacy of the license fee "after the commencement or completion of the work." Va. Code Ann. § 56-16.3(H).

## V.   Federal regulatory schemes preempt most state regulation of railroads.

48.     The federal government has long regulated rail transportation. Because rail transportation, by its very nature, is an interstate activity, Congress adopted a "uniform regulatory scheme" to govern railroad operations. *Skidmore v. Norfolk S. Ry.*, 1 F.4th 206, 217 (4th Cir. 2021).

49.     In 1887, Congress passed the Interstate Commerce Act, which created the Interstate Commerce Commission (ICC) and aimed at eliminating interstate discrimination in transportation. This Act was described as one of the "most comprehensive regulatory plans that Congress has ever taken." *United States v. Baltimore &*

12

*O.R. Co.*, 333 U.S. 169, 175 (1948); *see also Chi & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

50.    Congress repealed and replaced this regulatory scheme in 1995 when it passed the Interstate Commerce Commission Termination Act (ICCTA). As its name suggests, this law abolished the ICC and created the Surface Transportation Board (STB) in its place. *Norfolk S. Ry v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010); 49 U.S.C. § 10501.

51.    Congress vested the STB with broad authority over rail transportation. The STB has exclusive jurisdiction over "transportation by rail carriers . . . with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers" and over "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities."  49 U.S.C. § 10501(b).

52.    Congress protected this regulatory scheme through an express preemption clause:  "the remedies provided under [ICCTA] with respect to regulation of rail transportation are ***exclusive and preempt the remedies provided under Federal or State law***." *Id.* (emphasis added). This preemption clause was written broadly to ward off potential state interference.

53.    ICCTA preempts state and local laws that (1) "may reasonably be said to have the effect of 'managing' or 'governing' rail transportation," (2) "discriminate against rail carriers," or (3) "unreasonably burden rail carriage." *Norfolk S. Ry v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010).

54.     It is equally well-settled that ICCTA expressly preempts state laws that would "impede rail operations or pose undue safety risks." *See, e.g., City of Ozark, Pet. for Decl. Order,* FD 36104, 2017 WL 3216840, at *1 (July 26, 2017); *reconsideration denied*, 2017 WL 6210930, at *3 (S.T.B. Dec. 7, 2017).

**VI.  The U.S. Constitution and Virginia Constitution Prohibit Uncompensated Takings.**

55.     The Fifth Amendment prohibits the government from taking "private property … for public use, without just compensation." U.S. Const. amend. V. This prohibition extends to the States through the Fourteenth Amendment. *See* U.S. Const. amend. 14*; see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

56.     The Takings Clause protects "the security of property," which is one of the "great obj[ects] of Gov[ernment]." *Kelo v. City of New London*, 545 U.S. 469, 496 (2005) (quoting 1 Records of the Federal Convention of 1787, p.302 (M. Farrand ed. 1911)).  It "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005).

57.     A taking must comply with "two distinct conditions" to satisfy the Takings Clause. *Kelo*, 545 U.S. at 496. First, "the taking must be for a 'public use,'" and second, "'just compensation' must be paid to the owner." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231-32 (2003).

58.     The Takings Clause imposes a "clear and categorical obligation" when a party exercises government power to "physically acquire[] private property." *Cedar*

*Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  This "physical appropriation of property" constitutes a per se taking, *id.* at 2072, and "[a] taking has always been found" when this occurs. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982). The taking party "must pay for what it takes." *Cedar Point Nursery*, 141 S. Ct. at 2071.

59.     A physical taking occurs when a party "occupies property" even without using "eminent domain to formally condemn property" or "physically tak[ing] possession of property without acquiring title to it." *Id*. A permanent occupation, in particular, creates a "special kind of injury" that is "qualitatively more severe." *Loretto*, 458 U.S. at 436. Even a temporary occupation, though, can constitute a taking. *Cedar Point Nursery*, 141 S. Ct. at 2073.

60.     The question of just compensation is a judicial question that "does not rest with the public, taking the property, through Congress or the legislature." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326. It is "normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'" *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 253 (4th Cir. 2022) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)).

61.     The Virginia Constitution likewise protects private property against takings. Article I, Section 11 states that the General Assembly "shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use." Va. Const. art. I, § 11.

62.     The Virginia Constitution is even more explicit than the federal constitution in requiring that takings be for a public use. The party taking property must "prov[e] that the use is public, without a presumption that it is." Va. Const. art. I, § 11. Any taking "for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development" is not for public use. Va. Const. art. I, § 11.

63.     Private companies that are not public service corporations or government utility corporations can only show a public use by meeting narrow statutory criteria. Va. Code Ann. § 1-219.1(A). These criteria include a showing that "a written agreement with a public corporation for use of the facility by the public," "the elimination of blight," or "the property taken is in a redevelopment and conservation area" and is either abandoned or at least one owner agrees to the taking. Va. Code Ann. § 1-219.1(A).

64.     Even when a taking is for a public use, the Virginia Constitution mandates just compensation. This compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking." Va. Const. art. I, § 11.

65.     But regardless of the "value of the property taken, lost profits and lost access, and damages to the residue," §56-16.3 states that "[d]irect expenses shall not exceed $5,000" unless CSXT petitions the SCC or reaches an agreement with the broadband service provider.

16

66.     CSXT holds and uses property for rail transportation according to various property interests, including fee simple ownership like the Railroad Property at issue here, leaseholds, and easements. As the U.S. Supreme Court recognized more than a century ago, a railroad's right-of-way has "the substantiality of the fee"—regardless of the legal vehicle by which the railroad operates over the land—and therefore has the "attributes of the fee, perpetuity and exclusive use and possession." *W. Union Tel. Co. v. Pa. R.R.*, 195 U.S. 540, 570 (1904).

67.     "The railroads, though dedicated to a public use, remain the private property of their owners, and their assets may not be taken without just compensation." *ICC v. Or.-Wash. R.R. & Nav. Co.*, 288 U.S. 14, 40–41 (1933) (collecting cases).

## VII.   Cox's Proposed Installation Interferes with CSXT's Exclusive Possession and Control of its Railroad Property.

68.     Cox's proposed installation deprives CSXT of its right to exclude and invades its constitutionally protected right to possess and occupy its property.

69.     The proposed installation will also implicate CSXT's management of its property and safety measures. It interferes with CSXT's ability to access its property, deprives CSXT of its ability to utilize the property that Cox seeks to acquire, requires CSXT to divert and allocate safety resources, and imposes burdens on CSXT to provide flagmen and continually monitor and maintain its property in relation to Cox's cable in the future, all without CSXT's standard agreement with appropriate maintenance, relocation, indemnification and adequate insurance requirements.

70.    In addition, the compressed timeframe in which CSXT must review and approve Cox's notice undermines railroad safety. To ensure that each proposed installation meets CSXT's reasonable engineering and safety requirements, CSXT requires a flagman or inspector on-site during the installation to protect CSXT's railroad operations, including CSXT's wayside and grade crossing signal systems.

71.    Here, due to timelines set in CSXT's collective bargaining agreements, CSXT has not had sufficient time to schedule flagging or inspector services (for which, again, Cox suggests that it is responsible).

72.    The statutory payments are inadequate to compensate CSXT for these costs and the value of crossing its property. The statute prohibits railroad companies from charging a license fee for installations within a public right-of-way, and establishes a presumptive cap of $5,000 for CSXT's "direct expenses". Va. Code Ann. § 56-16.3(G).

73.    The proposed crossing will also impose immediate direct costs on CSXT in excess of $5,000.00, including flagging costs.

74.    Cox's proposed installation will deprive CSXT of a licensing fee. But for §56-16.3, CSXT would have charged a $500 licensing fee (assuming Cox is correct that the installation is located within a public right of way).

75.    Cox, a Fortune 500 company, seeks to install this cable in a metropolitan area for private gain and economic development, not public use.

76.    CSXT will be without an adequate remedy if the proposed crossing moves forward. Cox's occupation of CSXT's property will cause ongoing impacts on

CSXT's operations, including safety and liability risks. Removing or disabling Cox's unlawful installation would create additional disruption and risks absent coordination with CSXT. And monetary damages would not fully compensate for this invasion.

## Count I
## Virginia Code § 56-16.3 is Preempted by ICCTA

77.     CSXT incorporates by reference each allegation set out above as if set out herein and in full.

78.     CSXT owns and controls the Railroad Property in fee simple.

79.     Cox seeks to enter CSXT's Railroad Property and install conduit and a fiber optics cable on that property without complying with CSXT's existing permitting processes designed to promote rail and public safety.  This installation will permanently occupy CSXT's property and impact CSXT's ongoing and future management of its property.

80.     Virginia Code § 56-16.3 is preempted by the ICCTA, 49 U.S.C. § 10501(b). To begin, it discriminates against CSXT and other railroad companies by imposing requirements that do not apply to other businesses, including a cap on compensation for the use and occupation of railroad property and the imposition of substantial procedural obstacles to obtaining additional compensation.

81.     Virginia Code §56-16.3 confers a permanent right to occupy CSXT's property to Cox without any mechanism for CSXT to address conflicts between installed broadband crossings and rail operations. The law fails to establish any process for resolving these conflicts, and it fails to provide any standards about the obligations of either party beyond the initial installation.

82.    Virginia Code §56-16.3 limits CSXT's ability to manage its property by forcing CSXT to allocate limited resources to the installation of a crossing on a short timeline.

83.    Virginia Code §56-16.3 interferes with CSXT's operations and enforcement of its safety policies.

84.    Virginia Code §56-16.3 imposes a heavier burden to protect against a harmful crossing—"undue hardship" or "imminent likelihood of danger to public health or safety"—than is required under ICCTA.

85.    Virginia Code § 56-16.3 also restricts CSXT's ability to adequately evaluate whether Cox's installation conforms with engineering and safety policies and whether the proposed crossing will unreasonably interfere with rail operations or cause undue safety risks.

86.    Cox's proposed installation in the Notice also will unreasonably interfere with rail operations and cause undue safety risks.  Cox seeks to proceed with the installation without providing sufficient time to allow scheduling of flaggers and inspection services so that CSXT can ensure the installation complies with Cox's proposed installation plans.  Cox also refuses to enter into an agreement governing the ongoing and future use of CSXT's property, with the appropriate maintenance, relocation, indemnification and insurance requirements.

87.    The Court should enter a judgment under 28 U.S.C. § 2201 declaring that Cox cannot access CSXT's property because Va. Code § 56-16.3 is preempted by ICCTA on its face and as applied to CSXT and is therefore void and unenforceable.

88.   The Court should further enjoin Cox from proceeding with the proposed crossing under § 56-16.3.

89.   If Cox installs the proposed installation under color of §56-16.3, the Court should further enter a judgment declaring that Cox has no valid easement to use that crossing and CSXT retains the right to exclude Cox from its property.

90.   If Cox installs the proposed installation under color of §56-16.3, the Court should award CSXT at least nominal damages for Cox's invasion of CSXT's property rights in violation of federal law.

**Count II**
**Virginia Code § 56-16.3 Violates the Federal Takings Clause**

91.   CSXT incorporates by reference each allegation set out above as if set out herein and in full.

92.   The proposed crossing under Virginia Code § 56-16.3 violates the Fifth Amendment of the United States Constitution.

93.   The proposed crossing imposes direct costs on CSXT in excess of $5,000.00 and deprives CSXT of a licensing fee if the property at issue is within a public right of way.

94.   The proposed crossing would permanently and temporarily physically occupy CSXT's property for Cox's private gain and without just compensation. Virginia Code § 56-16.3 allows Cox to do so.

95.   CSXT is entitled to a judgment declaring that declaring that Cox cannot access CSXT's property because Virginia Code § 56-16.3 violates the Federal Takings Clause, and is therefore unconstitutional.

21

96.    CSXT is entitled to injunctive relief because monetary relief is inadequate compensation for the deprivation of CSXT's fundamental rights and the ongoing harm to its interest in its real property.

## Count III
## Virginia Code § 56-16.3 Violates the Virginia Takings Clause

97.    CSXT incorporates by reference each allegation set out above as if set out herein and in full.

98.    The proposed crossing under Virginia Code § 56-16.3 violates Article 1, Section 11 of the Virginia Constitution.

99.    The proposed crossing is not for public use and is instead for economic development and private gain.

100.    The proposed crossing imposes direct costs on CSXT in excess of $5,000.00 and deprives CSXT of a licensing fee if the property at issue is within a public right of way.

101.    The proposed crossing would permanently and temporarily physically occupy CSXT's property for Cox's private gain and without just compensation. Virginia Code § 56-16.3 allows Cox to do so.

102.    Virginia Code § 56-16.3 shifts the burden of proof for showing that the proposed taking is for public use. Rather than requiring Cox to show how its use and occupation of CSXT's property is for public use, it puts the burden on CSXT to petition the SCC for relief.

103.    CSXT is entitled to a judgment declaring that declaring that Cox cannot access CSXT's property because Virginia Code § 56-16.3 violates the Virginia Takings Clause, and is therefore unconstitutional.

104.    CSXT is entitled to injunctive relief because monetary relief is inadequate compensation for the deprivation of CSXT's fundamental rights and the ongoing harm to its interest in its real property.

**Count IV**
**Virginia Code § 56-16.3 Violates Due Process**

105.    CSXT incorporates by reference each allegation set out above as if set out herein and in full.

106.    The Due Process Clause entitles CSXT to the procedures required by state law. U.S. Const. amend. XIV.

107.    The proposed taking under Virginia Code § 56-16.3 would deprive CSXT of its property without affording it the process required by state law. State law places the burden on the party taking property to show that its taking would be for public use, but Virginia Code § 56-16.3 shifts the burden to CSXT to challenge a crossing and does not provide a challenge on the ground that the proposed crossing is for the private use of Cox.

108.    CSXT is entitled to a judgment declaring that declaring that Cox cannot access CSXT's property because Virginia Code § 56-16.3 violates the Due Process Clause, and is therefore unconstitutional.

109.    CSXT is entitled to injunctive relief because monetary relief is inadequate compensation for the deprivation of CSXT's fundamental rights and the ongoing harm to its interest in its real property.

## Prayer for Relief

WHEREFORE, the Plaintiff requests the following relief:

a.  A judgment against Cox declaring that the exercise of Va. Code § 56.16-.3 on the Railroad Property is preempted by federal law and is therefore void and unenforceable;

b.  A judgment against Cox declaring that the exercise of Va. Code § 56.16-.3 on the Railroad Property as applied to CSXT violates the Takings Clause of the Fifth Amendment of the United States Constitution and is therefore unconstitutional;

c.  A judgment against Cox declaring that the exercise of Va. Code § 56.16-.3 on the Railroad Property as applied to CSXT violates the Due Process Clause of the Fifth Amendment of the United States Constitution and is therefore unconstitutional;

d.  A judgment against Cox declaring that the exercise of Va. Code § 56.16-.3 on the Railroad Property as applied to CSXT violates Section 11 of Article I of the Virginia Constitution and is therefore unconstitutional;

e.  Preliminary injunctive relief restraining Cox, and their employees or agents, from crossing CSXT's property on the Railroad Property while this litigation is pending.

f.  Permanent injunctive relief restraining Cox, and their employees or agents, from using Va. Code § 56-16.3 to cross the Railroad Property;

g.  Nominal or compensatory damages;

h.  An award of attorney's fees, as permitted by law;

i.  Its other costs expended in this matter; and

j.  Any other relief to which it may be entitled.

Dated:  April 12, 2024                    Respectfully submitted,


 */s/ Thomas R. McCarthy*
Thomas R. McCarthy
Gilbert Dickey*
Kathleen S. Lane*
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
katie@consovoymccarthy.com
gilbert@consovoymccarthy.com

*Counsel for CSX Transportation, Inc.*

**PHV Application Pending*